ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

JUL 0 2 2015

JAMES N. ~~~~, Clerk
By: _____
Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. HERRETTA PICKENS and TERESA WILLIAMS, ) ) ) ) | |
| STATE OF GEORGIA ex rel. HERRETTA PICKENS and TERESA WILLIAMS ) ) ) ) | **WSD** |
| | **1:15-CV-2381** |
| Plaintiff-Relator, ) | Civil Action No. _____ |
| ) | Jury Trial Demanded |
| v. ) | FILED UNDER SEAL |
| ) | |
| SOUTHERN PAIN INSTITUTE, P.C. d/b/a ) SOUTHERN SPINE & PAIN INSTITUTE; ) LAGINAPPE, LLC; PARISH PHARMACY, ) LLC; ANTHONY CLAVO, M.D.; ) and LYNN CLAVO, ) ) | |
| Defendants. ) | |

## COMPLAINT

Relators Herretta Pickens and Teresa Williams, on behalf of themselves, the

United States of America, and the State of Georgia, bring this action and would

show the following:

### JURISDICTION AND VENUE

1.     This action arises under the Federal False Claims Act, as amended, 31

U.S.C. §§ 3729 *et seq.*, and the State False Medicaid Claims Act, Ga. Code Ann.

§§ 49-4-168.1 *et seq.*

2.     This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 3732(a), 31 U.S.C. § 3732(b), and 28 U.S.C. § 1331.

3.     This court has personal jurisdiction over Defendants and is a proper venue pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1931(b) in that Defendants do or transact business in this jurisdiction and the violations of the False Claims Acts described herein were carried out in this district.

### THE PARTIES

4.     Southern Spine & Pain Institute ("SSPI") is a business owned and operated by Dr. Anthony Clavo. Upon information and belief, SSPI consists collectively of pain management clinics (the "Clinics") (operated under Southern Pain Institute, P.C.), ambulatory surgical centers (the "ASC") (operated under Laginappe [sic], LLC), and retail pharmacies (the "Pharmacies") (operated under Parish Pharmacy, LLC).

5.     SSPI's primary office is at 1975 West Hwy 54, Fayetteville, Georgia 30214. It also operates satellite offices at 1501 Milstead Road, Conyers, Georgia 30013, and at 3886 Princeton Lakes Way, Suite 240, Atlanta, Georgia 30331.

6.     Dr. Anthony Clavo, M.D. ("Dr. Clavo") is the owner, operator, and CEO of Southern Spine & Pain Institute, P.C. and Laginappe, LLC, and at all times

2

relevant to this complaint, the only physician or surgeon practicing at SSPI. Dr. Clavo's NPI is 1851447890.

7.      Lynn Clavo is Dr. Clavo's wife, as well as the registered CFO and Secretary of Southern Pain Institute, P.C., and Owner and Chief Pharmacist for Parish Pharmacy, LLC.

8.      Relator Herretta Pickens, R.N., has a Master of Science in Nursing, and was employed by Southern Spine & Pain Institute as a nurse practitioner from September 2014 until her constructive termination on March 6, 2015. As the nurse practitioner in a pain clinic, her job duties normally would be expected to include routine review of patient status attendant to renewal of pain medicine prescription and monitoring the effectiveness of treatment regimes, as well as recommending procedures for pain relief to be performed by the physician.

9.      Teresa Williams was employed by Southern Spine & Pain Institute as a front office administrator from July 2014 until she was constructively terminated on March 5, 2015. Her job responsibilities included scheduling patients who were examined at the Clinics for procedures at the ASC. She also performed check-in and check-out procedures and collected co-pays, for both clinic and ASC patients.

## FEDERALLY FUNDED HEALTH PROGRAMS

10.      Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.*, establishes

3

the Health Insurance for the Aged and Disabled Program, popularly known as the Medicare program. The Secretary of Health and Human Services ("HHS") administers the Medicare Program through the Centers for Medicare and Medicaid Services ("CMS").

11. The Medicare program is comprised of four parts. Medicare Part A ("Hospital Insurance") provides basic insurance for the costs of hospitalization and post hospitalization care. 42 U.S.C. §§ 1395c-i-5. Medicare Part B ("Medical Insurance") is a federally subsidized, voluntary insurance program that covers the fee schedule amount for doctors' services, outpatient care, medical supplies, and laboratory services, including facility dialysis treatments. 42 U.S.C. §§ 1395j-w-5. Medicare Part C ("Medicare Advantage Plans") is a plan offered by private insurers that contract with Medicare to provide Part A and Part B benefits. 42 U.S.C. §§ 1395w-21-w-28. Medicare Part D ("Prescription Drug Coverage") is a plan offered by private insurers approved by Medicare to provide basic insurance for prescription drugs. 42 U.S.C. §§ 1395w-101-w-154.

12. Reimbursement for Medicare Part A claims is made by the United States through CMS. Hospitals submit Medicare Part A claims directly to CMS, which in turn makes a standard, bundled payment based on a DRG diagnostic code.

4

13.     Reimbursement for Medicare Part B claims is made by the United States through CMS. CMS, in turn, contracts with fiscal intermediaries to administer and pay Medicare Part B claims from the Medicare Trust Fund. 42 U.S.C. § 1395(u). In this capacity, the fiscal intermediaries act on behalf of CMS. 42 C.F.R. § 421.5(b). Separate payments are made for each CPT procedural code listed on the Medicare Part B claims.

14.     Reimbursement for Medicare Part C claims is made by the United States through CMS. CMS makes fixed monthly payments to each Medicare Choice organization for each enrolled individual, i.e., a capitated payment.

15.     Reimbursement for Medicare Part D claims is made by the United States through CMS. CMS reimburses the insurance plans for a percentage of its payments for prescription drugs.

16.     In order to receive Medicare funds, enrolled providers, SSPI and Dr. Clavo, together with its authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and all applicable policies and procedures issued by the states.

17.     The Care Improvement Plus Medicare Advantage plan was specifically designed for beneficiaries with Medicare only who don't qualify for the Medicare

5

Special Needs Plans (such as spouses and caregivers of Special Needs Plan members).

18.     Among the rules and regulations which enrolled providers, including Defendants, agree to follow are to: (a) bill Medicare for only those covered services which are medically necessary; (b) not bill Medicare for any services or items which were not performed or delivered in accordance with all applicable policies, nor submit false or inaccurate information relating to provider costs or services; (c) not engage in any act or omission that constitutes or results in over-utilization of services; (d) comply with state and federal statutes, policies and regulations applicable to the Medicare Program; and (e) not engage in any illegal activities related to the furnishing of services to recipients.

19.     Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.* establishes Medicaid, a federally assisted grant program for the States. Medicaid enables the States to provide medical assistance and related services to needy individuals. CMS administers Medicaid on the federal level. Within broad federal rules, however, each state decides who is eligible for Medicaid, the services covered, payment levels for services and administrative and operational procedures.

20.     At all times relevant to this Complaint, the United States provided funds to the States through the Medicaid program pursuant to Title XIX of the Social

6

Security Act, 42 U.S.C. §§ 1396 *et seq.* Enrolled providers of medical services to Medicaid recipients are eligible for payment for covered medical services under the provisions of Title XIX of the 1965 Amendments to the Federal Social Security Act.

21.     By becoming a participating provider in Medicaid, enrolled providers agree to abide by the rules, regulations, policies and procedures governing claims for payment, and to keep and allow access to records and information as required by Medicaid. In order to receive Medicaid funds, enrolled providers, together with authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and all applicable policies and procedures issued by the State.

22.     TRICARE is a government-funded program that provides medical benefits to retired members of the Uniformed Services and to spouses and children of active duty, retired, and deceased members, as well as reservists who were ordered to active duty for thirty (30) days or longer. The program is administered by the Department of Defense and funded by the federal government.

7

23. Veterans of the United States military receive insurance benefits ("VA Insurance") through the Veterans Health Administration, a component of the U.S. Department of Veterans Affairs.

24. Medicare, Medicaid, TRICARE, VA Insurance, and Medicare Advantage Plans are hereinafter collectively referred to as "Government Insurance."

25. At all times relevant to this complaint, SSPI and Dr. Clavo were enrolled in and sought reimbursement from Government Insurance.

## Anti-Kickback Statute

26. The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) ("AKS"), arose out of Congressional concern that if those who influence healthcare decisions were allowed to have a financial stake in selection of healthcare goods and services, their judgment might be tainted, resulting in goods and services being provided that are medically unnecessary, of poor quality, or even harmful.

27. To protect the integrity of government programs, in 1972 Congress enacted a per se prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality of care, strengthening that statute in 1977 and again in 1987. See Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142;

8

Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No.

100-93.

28.    Among other provisions, the AKS makes criminal certain types of

remunerative arrangements:

(b) Illegal remunerations.

(1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind-

(A)   in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B)   in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person –

(A)   to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B)   to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item

9

.

> for which payment may be made in whole or in part under a
> Federal health care program,

> shall be guilty of a felony and upon conviction thereof, shall be fined
> not more than $25,000 or imprisoned for not more than five years, or
> both.

42 U.S.C. § 1320a-7b.

29.     Violations of the Anti-Kickback Statute that implicate Government

Insurance beneficiaries constitute violations of the False Claims Act.

## FRAUDULENT SCHEMES

30.     When Relator Pickens began to work for SSPI in September 2014, she was

one of three NPs, all of whom were recent hires. She was told by both office

personnel and patients that she "wouldn't last long" because "nobody did."

31.     At the outset of her employment, Relator Pickens and Dr. Clavo agreed

that she would examine a maximum of 25 patients per day. Relator Pickens

believed this was the most patients she could properly examine in one day while

also documenting the results of the examination for the patients' records and

recording appropriate information to support medical billing, known collectively

as "charting."

32.     As an NP, Relator Pickens understood her job to be meeting with and

examining the patients. During that exam, they would discuss the efficacy of

current treatment regimes, determine whether a drug prescription (or renewal)

10

was appropriate, and if necessary, suggest procedures to assist with pain management. Dr. Clavo was then expected to review the suggestions and, if he agreed with their necessity, sign the prescriptions. Other procedures would be scheduled for Dr. Clavo to perform on separate visits, often weeks apart if more than one procedure was needed.

### Failure to Collect or Maintain Medical Records

33.    In order to properly examine a patient, evaluate the effectiveness of past procedures, and suggest possible future procedures, Relator Pickens needed to review the medical records for her patients. To her surprise, she was assigned patients to examine with no supporting documentation provided at all.

34.    Relator Pickens then requested the medical records from Rebeca Rosh, office director, who would promise to "get those to you" but never delivered. Relator Williams observed these interactions and can attest to them.

35.    Finally, Relator Pickens went straight to Dr. Clavo himself and asked for medical records. His response was the same—that he would get her the charts of the patients she was examining. However, the charts never appeared.

36.    Relator Pickens eventually discovered that prior to her arrival, Dr. Clavo and SSPI did not create any documentation for the patients' visits. There simply were no charts to show her.

11

37.    In fact, the only charts she was able to use during her employment at SSPI were those that she had made herself from her own examinations.

38.    Because there were no patient records, Relator Pickens did not know what procedures had been previously performed on patients or how effective they might have been in relieving a patient's pain. As a result, Relator Pickens lacked information sufficient to order treatments.

39.    For example, if a patient had previously had a trigger point injection but it was not effective in relieving the patient's pain, further trigger point injections would be medically unreasonable and unnecessary, and the lack of documentation prevented her from ordering a different procedure that might better aid the patient.

40.    Without any records, however, Relator Pickens was at a loss as to what she should order, and so refused to order what may be unnecessary procedures.

41.    As discussed below, however, this did not stop Dr. Clavo, who began going behind Relator Pickens and ordering procedures himself.

42.    Relator Pickens was not the only one to ask for records and be stonewalled: as she came to find out, any requests for charts directed to SSPI, whether by patients, outside physicians, or in at least one case a workers'

12

compensation attorney, are slow-played or outright denied because the records simply do not exist.

43.    Relator Pickens was appalled when she eventually came to discover the reasons for this lack of records.

44.    First, Dr. Clavo did not want examination records that would not support the procedures he was ordering or requiring to be ordered for the patients.

45.    Secondly, by failing to chart for the patients, SSPI holds the patients captive. Patients cannot go to another pain management clinic without their records, including original referral information, and if they try, they are turned away as likely to be simply drug seeking.

46.    About a month after Relator Pickens' arrival, around October 2014, SSPI changed billing companies and consequently stopped using hard copy superbills for visits, moving instead to electronic records and billing.

47.    Relator Pickens was given a laptop, which she was to use to chart her patients.

48.    Within the first few months of Relator Pickens' employment, the two other nurse practitioners quit, and Dr. Clavo increased Relator Pickens' work load to approximately 40 patients per day, demanding that she see at least five patients

13

per hour, and berated her when she spent more time with the patients than
necessary to perform prescription refills and order procedures.

49.    Relator Pickens was unable to examine that many patients in one day and
complete her charting, so she began to perform charting after normal work
hours.

50.    Beginning in January 2015, Dr. Clavo took away Relator Pickens' work
laptop at the end of the day so that she could not chart the examinations she had
performed even during off hours.

51.    Upon information and belief, this is because Relator Pickens' actual
examination notes would not have supported the procedures that Dr. Clavo was
performing on the patients.

52.    When Relator Pickens complained that she was not given sufficient time to
performing the chart necessary to bill, Dr. Clavo and Lynn Clavo demanded that
Relator Pickens enter all of the billing for the examinations even before she
charted any of them.

53.    Dr. Clavo told Relator Pickens that Lynn Clavo, as co-owner of SSPI,
recommended that he submit claims for payment to insurance providers for
those individuals who did not have completed charting to support those claims.

14

## *Medically Unnecessary and Unreasonable Procedures*

54.    By mid-November 2014, as Relator Pickens tried to understand what procedures had been performed by talking with the patients, she learned that Dr. Clavo regularly performed medically unreasonable and unnecessary procedures.

55.    For example, patient KN had a hand injury and received regular hand injections. Patient KN told Relator Pickens that Dr. Clavo had performed a sphenopalatine ganglion block, which is performed transnasal and is to treat chronic facial and head pain, such as headaches or migraines.

56.    Not only was this treatment medically unreasonable and unnecessary, since Patient KN did not complain of those symptoms, but it is also quite painful for the patient.

57.    When Relator Pickens questioned why the patients had allowed Dr. Clavo to perform these procedures, they told her he had made distribution of their pain medications contingent on their agreement to have the procedures performed.

58.    This was confirmed as Relator Pickens continued to work with Dr. Clavo.

59.    Dr. Clavo would often yell at Relator Pickens for not scheduling enough procedures for him to perform.

60.    When she told him she could not responsibly schedule procedures without the patients' charts, he told her to schedule procedures anyway.

15

61.     Even when a patient was feeling relief from pain, Dr. Clavo demanded
that more procedures be ordered.

62.     Because the prescriptions issued by SSPI are pain killers that are classified
as controlled substances, the prescription has to come from Dr. Clavo, and
cannot come from Relator Pickens.

63.     At the end of a patient's visit, Dr. Clavo regularly refused to sign a
prescription unless Relator Pickens agreed to schedule the patient for multiple
procedures at later dates.

64.     If Relator Pickens refused to order procedures, Dr. Clavo would bypass
her and order, perform, and bill procedures without examining the patient or
performing any other evaluation of medical reasonableness or necessity.

65.     Dr. Clavo would demand, perform, and bill for procedures without any
imaging being performed on patients.

66.     Over time, Relator Pickens observed that patients would schedule
procedures so that they could receive a prescription, but then cancel or simply
not show up for the scheduled procedures, which they know are pointless. In
those cases, Dr. Clavo would hold their next prescription refill.

67.     Certain procedures, such as splenopalatine ganglion block, selective nerve root blocks, medial branch blocks, and stellate ganglion blocks require precertification from Government Insurance prior to performance.

68.     Dr. Clavo instructs his staff lie to Government Insurance about the patients' health and needs to get them precertified for these procedures.

69.     If SSPI cannot get a patient precertified for the procedure that has been ordered in time to administer it, Dr. Clavo is undaunted – he simply performs a different procedure that does not require precertification (such as cervical and lumbar epidural injections), even if it is medically unreasonable and unnecessary, and bills Government Insurance for that procedure instead.

70.     For example, on many occasions, when SSPI was denied precertifications to perform back injections, Dr. Clavo performed shoulder injections instead, which do not require precertifications, and billed Government Insurance for them.

71.     Dr. Clavo also had a rule that each procedure had to be scheduled on a different day so that he could bill Government Insurance for each of them, resulting in patients having to return repeatedly to have procedures done, whether they were medically necessary or not.

17

72.     For example, on March 5, 2015, in an event that led to both Relators

leaving, Dr. Clavo demanded that Relator Pickens order nine procedures for a

single patient, and expected Relator Williams immediately to schedule those nine

procedures for nine different days.

## *SSPI Performs Procedures with Unlicensed, Unqualified Staff at Uncertified Ambulatory Surgical Centers*

73.     In Georgia, Ambulatory Surgical Centers must abide by the Rules and

Regulations for Ambulatory Surgical Treatment Centers, at Chapter 290-5-33 of

the Georgia Department of Community Health ("DCH Rules").

74.     Ambulatory Surgical Centers providing services Medicare Part B

beneficiaries and submitting claims for those services must comply with State

licensure requirements, pursuant to 42 C.F.R. § 416.40.

75.     Ga. Code. Ann. § 31-6-40 requires that each of SSPI's ASC obtain a

Certificate of Need ("certified") in order to operate in the state of Georgia.

76.     The Laginappe Surgical Center at the Peachtree City office became

certified in January 2015.

77.     The ASC at the Conyers and Atlanta locations have never been certified.

78.     Like the Clinics, the ASC did not maintain patient medical records, in

violation of 42 C.F.R. § 416.47, which requires that the "ASC must maintain

18

complete, comprehensive, and accurate medical records to ensure adequate patient care."

79.    By failing to document proper pre- and post-surgical assessments in the patients' medical records, SSPI is in violation of 42 C.F.R. § 416.52 and DCH Rule 290-5-33-.12.

80.    Pursuant to 42 C.F.R. § 416.46, the "nursing services of the ASC must be directed and staffed to assure that the nursing needs of all patients are met" and "[n]ursing services must be provided in accordance with recognized standards of practice. There must be a registered nurse available for emergency treatment whenever there is a patient in the ASC."

81.    At various times throughout its operations of ASC, SSPI has not employed a registered nurse, but has performed procedures on patients without a registered nurse, or other qualified professional, present to assist Dr. Clavo.

82.    When Relator Pickens first began to work for SSPI, it employed a registered nurse, but in less than a month, she quit.

83.    This was an ongoing issue for SSPI – hiring nurses (or other staff) who quit soon thereafter, often due to the same concerns as alleged herein.

84.    When it did not have a registered nurse on staff, SSPI used medical assistants when performing procedures, including when performing conscious

19

sedation, in violation of 42 C.F.R. §§ 416.46 and 416.48, and DCH Rules 290-5-33-.09(1), (3), and (4).

85.    42 C.F.R. § 416.48 requires that the "ASC must provide drugs and biologicals in a safe and effective manner, in accordance with accepted professional practice, and under the direction of an individual designated responsible for pharmaceutical services."

86.    One of the medical assistants, Cathy Hartfield, had not practiced in many years, and was not properly trained in CPR, was not certified, and was not licensed, but regularly acted as Dr. Clavo's only assistant in procedures.

87.    Dr. Clavo was aware that he was supposed to have a registered nurse or better in the ASC with him when performing surgeries, and so he requested that Relator Pickens sign her name as being present, but Relator Pickens refused.

88.    The medical assistants sometimes perform procedures for Dr. Clavo, including nerve blocks and trigger point injections.

89.    Dr. Clavo is not always in the room for these procedures when they are performed by the medical assistants.

90.    Upon information and belief, these procedures, performed by unqualified medical assistants, are billed under Dr. Clavo's NPI.

### Violations of the Anti-Kickback Statute

20

91.     SSPI operates separate clinics, ASC, and pharmacies, under different

corporate entities with different NPI from one another.

92.     Dr. Clavo mandated that the staff at the Clinics, including Relator Pickens,

order procedures for patients to be performed at the SSPI ASC.

93.     Dr. Clavo does not allow the staff at the Clinics to offer other ASC that

could perform the procedures, as his primary motive in mandating these

procedures is his financial interest in the ASC.

94.     Dr. Clavo also requires that any outpatient prescriptions that he prescribes

be filled at the Pharmacy.

95.     The Pharmacy is owned and operated by Lynn Clavo, Dr. Clavo's wife.

96.     Every procedure performed at the ASC and every filled prescription at the

Pharmacy results in financial gain to Dr. Clavo, motivating Dr. Clavo and his

staff to over-prescribe procedures and medications.

### Violation of Georgia Pain Management Clinic Ownership Law

97.     On May 2, 2013, Georgia Governor Nathan Deal signed Georgia House Bill

178, effective July 1, 2013, titled the "Georgia Pain Management Clinic Act,"

designed to crack down on illicit sales and over-prescribing of prescription drugs

by "pill mills."

98. Ga. Code Ann. 43-34-283 requires that all pain management clinics be owned exclusively by physicians licensed in Georgia, unless they fall within one of two exceptions in Ga. Code Ann. 43-34-283(b)(1), for physician assistants and advanced practice registered nurses.

99. Dr. Clavo told Relator Pickens that Lynn Clavo was an owner of Southern Pain Institute, P.C. Therefore, upon information and belief, Lynn Clavo, a non-physician, is part owner of Southern Pain Institute, P.C., as well as its CFO and Secretary, in violation of the Georgia Pain Management Clinic Act.

### *Dr. Clavo Demanded that Relators Participate in Billing Fraud*

100. After only about four months of the new billing company, in about February 2015, Dr. Clavo reinstituted the use of superbills.

101. On February 23, 2015, Relator Pickens examined 39 patients, at least 22 of whom receive Government Insurance benefits. Of those patients, 7 receive Medicaid benefits: Patient MB (Patient Number 2384); Patient CF (SP1279); Patient KG (SP1489); Patient TL (SP2275); Patient JM (SP2544); Patient JO (SP2878); and Patient BR (SP3186). Of those patients, 7 receive Medicare Part B benefits: Patient MB (SP468); Patient HC (SP917); Patient CE (SP1204); Patient JH (SP4461); Patient TH (SP2299) as secondary provider; Patient TP (SP3129) as secondary provider; and Patient KS (SP3724) as secondary provider. Patient TH

22

(SP1915) receives Humana Medicare benefits. Patients SM (SP2516), DT (SP3910), and TW (SP4513) receive Care Improvement Plus benefits. Patient BP (2471) receives Wellcare Medicare HMO benefits. Patient DS (SP3440) receives TriCare South Region Benefits. Patient KS (SP3651) receives BCBS Medicare benefits. Patient JV (SP3953) receives Veterans Administration benefits.

102. On February 24, 2015, Relator Pickens examined 42 patients, at least 35 of whom receive Government Insurance benefits. The following patients receive Medicaid benefits: Patient LB (SP245); Patient FB (SP4508); Patient LC (SP4427); Patient JD (SP1000); Patient EE (2412); Patient PH (SP1827); Patient DI (SP1957); Patient AL (SP2230); Patient MM (SP2597); Patient AM (SP4350); Patient JM (SP2704); Patient KN (SP2821); Patient SP (SP2934); Patient SP (SP3058); Patient RS (SP3419); Patient DS (2262); Patient SS (2296); Patient CT (SP4439); Patient GS (SP4366) was seen twice in the same day; and Patient TT (SP3836) was seen twice in the same day. The following patients receive Medicare Part B benefits: Patient JB (SP558); Patient PB (SP630); Patient FD (2400); Patient RD (SP1094); Patient LF (SP1278); Patient PN (SP2822); Patient DP (2283); Patient JV (SP3974); Patient DW (SP4017); and Patient BW (2406). Patients AB (2267) and DC (SP898) receive Veterans Administration benefits. Patient LB (SP629) receives TriCare Prime

23

benefits. Patient PH (SP1738) receives Care Improvement Plus benefits. Patient
TP (2464) receives Wellcare Medicare HMO benefits.

103.    On or about March 4, 2015, Dr. Clavo demanded that Relator Pickens sign
a superbill for each of the patients she examined on February 23 and 24 so that
SSPI could bill for them.

104.    Relator Pickens refused to sign the superbill, arguing that she had not been
allowed to chart for those patients, that it was illegal to sign and bill without
charting, and she would not be responsible for causing billing that could not be
properly supported.

105.    As witnessed by Relator Williams, Dr. Clavo refused to allow Relator
Pickens to leave for the day and threatened to fire the entire staff (including
Relator Williams) if Relator Pickens would not sign the superbill. The staff did
not understand the legal ramifications of what Dr. Clavo was asking her to do,
and many joined him in demanding that she sign.

106.    Finally Relator Pickens pretended to sign the superbill by making a mark
so that she and the staff would be allowed to leave.

107.    The following morning Relator Pickens and Dr. Clavo had an argument
about his refusal to operate his practice in a legal and ethical manner, and Relator
Pickens' concerns that Clavo's actions put her own license in jeopardy.

24

108.   That same morning the staff verbally attacked Relator Pickens for not simply signing the superbills as Dr. Clavo requested.

109.   Dr. Clavo's refusal to let Relator Pickens leave until she assisted with his fraud constitutes retaliation for her efforts to stop violations of the False Claims Act.

110.   On March 5, 2015, Relator Pickens examined a new patient. Because this was the patient's first visit to the clinic, no imaging had been performed, and Dr. Clavo had not examined the patient.

111.   Following her examination of the patient, Relator Pickens requested that Dr. Clavo sign a prescription. Dr. Clavo refused to sign, because Relator Pickens had not ordered any procedures for that patient.

112.   Without any consideration (or even knowledge) of the patient's medical needs or history, Dr. Clavo demanded that the patient be scheduled for nine different procedures, on nine different days.

113.   Dr. Clavo did not even specify which procedures should be performed, only that they had to total at least nine.

114.   Per Dr. Clavo's instructions, Relator Pickens brought the order to Relator Williams at the scheduling desk.

115.    When Relator Williams saw the orders, she thought that it was a joke; she could not believe Dr. Clavo expected her to schedule a single patient for nine procedures on nine different days, which would necessarily result in months of treatments.

116.    When Relator Pickens confirmed that this was in fact Dr. Clavo's orders, Relator Williams was shocked by this request, that Dr. Clavo would schedule a patient for nine procedures without knowing what was wrong with the patient, whether the procedures were medically necessary, and at that time not even knowing what those procedures would be!

117.    Relator Williams immediately went to Dr. Clavo's office to talk with him. Dr. Clavo yelled at her, berating her for bothering him, and told her to quit if she did not like it.

118.    Relator Williams quit immediately, refusing to participate in Dr. Clavo's fraud and blatant mistreatment of patients.

119.    Relator Williams was constructively discharged by Dr. Clavo and SSPI for her efforts to stop one or more violations of the False Claims Act.

120.    After one more effort to stop the fraud, Relator Pickens quit the next day, on March 6, 2015.

121. Relator Pickens was constructively discharged by Dr. Clavo and SSPI, who made the workplace untenable for Relator Pickens by demanding that she assist in the billing fraud and turning the staff against her for refusing to do so.

## COUNT I

### Violation of 31 U.S.C. § 3729 – Federal False Claims Act

122. Relators incorporate and reallege herein all other paragraphs as if fully set forth herein.

123. As set forth above, Defendants SSPI, Dr. Clavo, and Lynn Clavo, individually and by and through their agents, officers, and employees, knowingly presented or caused to be presented numerous false or fraudulent claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

124. As set forth above, Defendants SSPI, Dr. Clavo, and Lynn Clavo, individually and by and through their agents, officers, and employees, knowingly made, used, or caused to be made or used, false records or statements material to numerous false claims, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

125. Due to Defendants' conduct, the United States Government has suffered substantial monetary damages.

27

126.    The United States is entitled to treble damages based upon the amount of

damage sustained by the United States as a result of the aforementioned

violations of the Federal False Claims Act, 31 U.S.C §§ 3729-3733, in an amount

that will be proven at trial.

127.    The United States is entitled to a civil penalty of between $5,500 and

$11,000 as required by 31 U.S.C. § 3729(a) for each of the fraudulent claims and

statements.

128.    Relators are also entitled to reasonable attorney's fees and costs, pursuant

to 31 U.S.C. § 3730(d)(1).

## COUNT II

### Violation of Ga. Code Ann. § 49-4-168.1 – State False Medicaid Claims Act

129.    Relators incorporate and reallege herein all other paragraphs as if fully set

forth herein.

130.    As set forth above, Defendants SSPI, Dr. Clavo, and Lynn Clavo,

individually and by and through their agents, officers, and employees,

knowingly presented, or caused to be presented to the Georgia Medicaid

program numerous false or fraudulent claims for payment or approval, in

violation of O.C.G.A. § 49-4-168.1(a)(1).

131.    As set forth above, Defendants SSPI, Dr. Clavo, and Lynn Clavo, individually and by and through their agents, officers, and employees, knowingly made, used, or caused to be made or used, false records or statements material to numerous false claims, in violation of O.C.G.A. § 49-4-168.1(a)(2).

132.    Due to Defendants' conduct, the State of Georgia has suffered substantial monetary damages.

133.    The State of Georgia is entitled to treble damages based upon the amount of damage sustained by the State of Georgia as a result of the aforementioned violations of the State False Medicaid Claims Act, Ga. Code Ann. § 49-4-168.1, in an amount that will be proven at trial.

134.    The State of Georgia is entitled to a civil penalty of between $5,500 and $11,000 as required by Ga. Code Ann. § 49-4-168.1 for each of the fraudulent claims.

135.    Relators are also entitled to reasonable expenses which the court finds to have been necessarily incurred and reasonable attorney's fees and costs, pursuant to Ga. Code Ann. § 49-4-168.2(i).

## COUNT III

### Violation of 31 U.S.C. § 3730 – Retaliation (Pickens)

136.   Relators incorporate and reallege herein all other paragraphs as if fully set forth herein.

137.   SSPI and Clavo violated Relator Pickens' rights pursuant to 31 U.S.C.

§ 3730(h) by retaliating against her for lawful acts done by her in furtherance an action under the False Claims Act and other efforts to stop one or more violations alleged in this action.

138.   As a result of Defendants' actions, Relator Pickens has suffered damages in an amount to be shown at trial.

## COUNT IV

### Violation of Ga. Code Ann. § 49-4-168.4 – Retaliation (Pickens)

139.   Relators incorporate and reallege herein all other paragraphs as if fully set forth herein.

140.   SSPI and Clavo violated Relator Pickens' rights pursuant to Ga. Code Ann. § 49-4-168.4 by retaliating against Relator Pickens for lawful acts done by Relator Pickens in furtherance of an action under this section, including investigating matters that could reasonably lead to the filing of such an action.

30

141.   As a result of Defendants' actions, Relator Pickens has suffered damages in
an amount to be shown at trial.

## COUNT V

### Violation of 31 U.S.C. § 3730 – Retaliation (Williams)

142.   Relators incorporate and reallege herein all other paragraphs as if fully set
forth herein.

143.   SSPI and Clavo violated Relator Williams' rights pursuant to 31 U.S.C.
§ 3730(h) by retaliating against her for lawful acts done by her in furtherance an
action under the False Claims Act and other efforts to stop one or more violations
alleged in this action.

144.   As a result of Defendants' actions, Relator Williams has suffered damages
in an amount to be shown at trial.

## COUNT VI

### Violation of Ga. Code Ann. § 49-4-168.4 – Retaliation (Williams)

145.   Relators hereby incorporate and realleges herein all other paragraphs as if
fully set forth herein.

146.   SSPI and Clavo violated Relator Williams' rights pursuant to Ga. Code
Ann. § 49-4-168.4 by retaliating against Relator Williams for lawful acts done by

31

Relator Williams in furtherance of an action under this section, including

investigating matters that could reasonably lead to the filing of such an action.

147. As a result of Defendants' actions, Relator Williams has suffered damages

in an amount to be shown at trial.

## COUNT VII

### Breach of Contract

148. Relators incorporate and reallege herein all other paragraphs as if fully set

forth herein.

149. Dr. Clavo and SSPI refused to pay Relator Pickens' wages for her last days

working for SSPI.

150. As a result of Defendants' actions, Relator Pickens has suffered damages in

the amount of $2,780.

## COUNT VIII

### Violations of the Fair Labor Standards Act

151. Relators incorporate and reallege herein all other paragraphs as if fully set

forth herein.

152. SSPI's annual business revenues were in excess of $500,000.

32

153. Relator Williams worked on average 50-60 hours per week, including 12+ hour days, but SSPI only paid her for forty hours, no matter how many hours she worked.

154. SSPI manually altered the timesheets for Relator Williams to reflect that she had only worked 40 hours each week to avoid paying her overtime.

155. Relator Williams is entitled to one-and-one-half times pay for hours worked over 40 per workweek.

156. Section 16(b) of the Fair Labor Standards Act, 29 U.S.C. § 216(b), entitles an employee to recover all unpaid overtime compensation, an equivalent amount as liquidated damages, and reasonable attorneys' fees and costs.

157. At all times relevant to this action, Defendants willfully failed and refused to pay Relator Williams the federally-mandated overtime wages, to Relator Williams' damage in amounts to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Relators pray for judgment:

(a) awarding the United States treble damages sustained by it for each of the false claims;

(b) awarding the United States a civil penalty of $11,000 for each of the false claims and statements;

33

(c) awarding the State of Georgia treble damages sustained by it for each of
   the false claims;

(d) awarding the State of Georgia a civil penalty of $11,000 for each of the
   false claims;

(e) awarding Relators 30% of the proceeds of this action and any alternate
   remedy or the settlement of any such claim;

(f) awarding each Relator special damages resulting from the retaliation
   pursuant to 31 U.S.C. § 3730(h) and 49-4-168.4;

(g) awarding Relator Pickens $2,780 plus interest in unpaid wages;

(h) awarding Relator Williams liquidated damages pursuant to the Fair
   Labor Standards Act;

(i) awarding Relators their litigation costs and reasonable attorney's fees;
   and

(j) granting such other relief as the Court may deem just and proper.

Respectfully submitted,

Julie K. Bracker
Georgia Bar No. 073803
Jason Marcus
Georgia Bar No. 949698

**BRACKER & MARCUS LLC**
3225 Shallowford Road
Suite 1120
Marietta, GA 30062
Tel. (770) 988-5035
Fax (678) 648-5544
Julie@FCAcounsel.com
Jason@FCAcounsel.com

Oscar E. Prioleau, Jr.
Georgia Bar No. 588510
Prioleau & Milfort, LLC
271 17th Street, N.W., Suite 520
BB&T Tower - Atlantic Station
Atlanta, Georgia 30363
Tel. (404) 526-9400
Fax (404) 880-9360
oprioleau@mindspring.com